# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MASUMA KHAN,<br><br>   Petitioner,<br><br>   v.<br><br>KRISTI NOEM, et al.,<br><br>   Respondents. | Case No. 1:25-cv-01411-EPG-HC<br><br>ORDER GRANTING PRELIMINARY INJUNCTION[1] (ECF No. 9)<br><br>ORDER VACATING OCTOBER 24, 2025 MINUTE ORDER (ECF No. 12, 23)<br><br>ORDER DIRECTING PARTIES TO MEET AND CONFER AND SUBMIT JOINT STATEMENT |

Petitioner, represented by counsel, is an immigration detainee proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. The parties have consented to the jurisdiction of a United States magistrate judge. (ECF Nos. 15, 18, 19.) For the reasons stated herein, the Court grants a preliminary injunction.

## I.

## BACKGROUND

Petitioner's motion for temporary restraining order and accompanying declarations allege the following: Petitioner, a citizen of Bangladesh, came to the United States in August 1997 to be

---

[1] Upon agreement of the parties, the Court converts Petitioner's motion for temporary restraining order into a motion for preliminary injunction. Respondents had notice, opportunity to respond, and the ability to be heard. There is no benefit in additional briefing, and the standard is the same. As such, given the nature of the relief granted by this order and so as to appropriately permit Respondents the ability to appeal should they choose to do so, the Court converts this to a motion for preliminary injunction. See Bennett v. Medtronic, Inc., 285 F.3d 801, 804 (9th Cir. 2002) ("Ordinarily, temporary restraining orders, in contrast to preliminary injunctions, are not appealable . . . .").

1

the primary caretaker of her nine-year-old daughter, who was receiving emergency medical care for kidney failure. (ECF No. 9-3 at 1.[2]) Petitioner did not return to Bangladesh when her B-2 visa expired because her daughter required extensive medical treatment and support. (ECF No. 9 at 5; ECF No. 9-3 at 1–2.) Sometime around 1998, Petitioner was approached by a Bangladeshi man who promised to help her obtain a green card. He submitted a false asylum application on Petitioner's behalf, using a false name and claiming that Petitioner was a Rohingya refugee from Burma. (Id. at 2.) The man did not include Petitioner's address on the application, and only he received any notices about her case. (Id. at 3.) The man attended the asylum interview with Petitioner and purported to be her interpreter. Petitioner responded truthfully to the questions asked, and thus, did not corroborate the false facts submitted in the asylum application. (Id. at 2.) The asylum officer rejected the claim and referred the case to an immigration judge ("IJ") for further adjudication. (Id. at 4.) The man ceased communications with Petitioner and failed to inform her of the date of the IJ hearing, the notice of which was only sent to him.[3] (Id. at 3.) Accordingly, Petitioner did not attend the hearing, and on August 30, 1999, the IJ issued an *in absentia* removal order against Petitioner.[4] (ECF No. 9-3 at 4; ECF No. 16-2 at 6.)

In 2015, after Petitioner's husband became a United States citizen, he petitioned to adjust Petitioner's status through an I-130 and I-485 application. (ECF No. 9-3 at 3.) After the interview for the application, the United States Citizen and Immigration Services ("USCIS") administratively closed the application due to the removal order. (Id. at 4.) Petitioner then retained immigration counsel, who filed a motion to reopen her case, but on March 20, 2019, the Ninth Circuit denied the petition for review, finding that the agency did not abuse its discretion in denying the motion to reopen as untimely. (Id.; ECF No. 9-2 at 25–26.)

In February 2020, Petitioner was detained by Immigration and Customs Enforcement ("ICE") agents. (ECF No. 9 at 6; ECF No. 9-3 at 4.) Within a few hours, Petitioner was released with an order of supervision, which initially required her to check in with ICE every six months

---

[2] Page numbers refer to the ECF pagination stamped at the top of the page.
[3] This man was later convicted of fraud and sentenced to jail time. (ECF No. 9 at 6 n.1.)
[4] The IJ ordered Petitioner removed to Burma (Myanmar). (ECF No. 16-2 at 6.)

1  or so. (ECF No. 9-2 at 21–23; ECF No. 9-3 at 4.) Petitioner has appeared at all of her required
2  ICE check-ins. (ECF No. 9-3 at 4.) After her arrest, Petitioner promptly retained a new attorney
3  and with the assistance of counsel, Petitioner and her husband have submitted a pending
4  application to adjust her immigration status. (Id.)

5  On the morning of October 6, 2025, Petitioner was arrested and detained without warning
6  at her check-in with ICE in downtown Los Angeles. (ECF No. 9-3 at 5.) Without being provided
7  an interpreter, Petitioner was required to respond to questions and sign forms she did not
8  understand. (Id. at 5–6.) When Petitioner asked to speak to her attorney or her family, she was
9  repeatedly denied. She was only allowed to make a short phone call to her attorney after she
10 completed the required administrative matters. (Id. at 6.) To this day, Respondents have not
11 explained why Petitioner was detained or indicated whether they intend to remove her, to which
12 country she may be removed, or whether removal is imminent. (ECF No. 9 at 7.) On the evening
13 of October 6, 2025, Petitioner was transferred to the California City Detention Facility
14 ("CCDF"), where she has been detained ever since. (ECF No. 9-3 at 7.)

15 On October 22, 2025, Petitioner filed a petition for writ of habeas corpus. (ECF No. 1.)
16 On the morning of October 23, 2025, Petitioner's daughter contacted Petitioner's habeas counsel
17 by phone to inform counsel that Respondents had attempted to deport Petitioner earlier that
18 morning. (ECF No. 9-2 at 2–3.) In the early hours of October 23, 2025, around 12:30 a.m.,
19 CoreCivic[5] staff came to Petitioner's room and asked Petitioner to collect all of her medications[6]
20 in a bag and provide the bag to them. The staff did not explain why they were taking Petitioner's
21 medications, but Petitioner followed their instructions. Around 2:00 a.m., another CoreCivic staff
22 came to Petitioner's room to take Petitioner to intake and informed Petitioner that she would be
23 leaving, mentioning something about an 8:00 a.m. flight and Petitioner needing to sign papers.
24 Petitioner refused to sign any papers. (ECF No. 20-1 at 1.) Petitioner asked CoreCivic staff to
25 speak to her family and attorney but was not allowed. Over the next few hours, Petitioner was

---

[5] CoreCivic is the owner of CCDF. (ECF No. 20 at 10.)
[6] Petitioner has a number of medical conditions, including hypertension, peripheral arterial disease, asthma, hypothyroidism, pre-diabetes, general anxiety disorder, and a lens implant that requires specialized care. (ECF No. 9-3 at 8.) During her detention, Petitioner has not received all of her medications. (Id. at 8–9; ECF No. 20-1 at 8.)

taken back and forth from her room. She did not sleep at all and had heart palpitations throughout the night. (ECF No. 20-1 at 2.)

At around 6:00 a.m., Petitioner called her husband. In the morning, most, but not all, of Petitioner's medication was returned to her. Petitioner took her four morning medications and went to breakfast. Petitioner called her daughter and spoke briefly with her to inform her that Petitioner thought she was going to be deported. In the middle of the call, a CoreCivic officer came to Petitioner with a nurse and told Petitioner she had to go to medical. Petitioner followed them and was met with three other officers waiting for her. Instead of being taken to medical, Petitioner was taken to her room and the officer said they were taking her to the airport. In Petitioner's room, the officers presented her with papers to sign and some money, the source of and purpose for which Petitioner was unsure. The officers asked the person in the neighboring cell to pack Petitioner's clothes, and the officers brought Petitioner's effects out of her room. (ECF No. 20-1 at 2.)

Around 9:30 to 11:00 a.m., Petitioner was instructed to change and to get ready to leave. She was told that if she does not cooperate with being handcuffed, it would be done forcibly. Petitioner eventually agreed to go in a wheelchair and to be handcuffed. Approximately eight to ten officers were involved, and Petitioner noticed that there was a video camera that was recording. (ECF No. 20-1 at 2.) Petitioner was taken to a van outside and driven to the airport. During this whole process, Petitioner was confused—she was not provided any details and was never informed of where she was going other than mentions of "home country."[7] (Id. at 3.)

At about 1:45 to 2:45 p.m. at Los Angeles International Airport ("LAX"), while Petitioner was in the van, the driver contacted an ICE official who identified himself as John Feere. Feere asked Petitioner to consent to be deported, stating that it would be better and more comfortable if Petitioner agreed to leave now. Feere asked Petitioner if she would agree to deport approximately three times. Each time Petitioner refused. Thereafter, Petitioner was taken back to CCDF. When Petitioner arrived back at the facility around 6:30 p.m., Petitioner asked CoreCivic

---

[7] At the hearing, Respondents' counsel informed the Court that the flight was bound for Bangladesh.

4

staff for her medications, but they said they could not provide her medications that night because they needed a nurse for authorization and there was no nurse at the facility that night. The following morning, Petitioner received most of her medications back, but some were missing. (ECF No. 20-1 at 3.)

On October 23, 2025, Petitioner filed the instant motion for temporary restraining order ("TRO"). (ECF No. 9.) On October 24, 2025, the Court issued a minute order prohibiting Respondents from removing Petitioner from the United States or transferring Petitioner out of this District unless and until the Court orders otherwise. (ECF No. 12.) A copy of the minute order was served on Respondents that same day. (ECF No. 13.)

On October 24, 2025, at around 12:30p.m., Supervisory Detention and Deportation Officer ("SDDO") Gilbert visited Petitioner at the detention facility (ECF No. 20-1 at 3.) SDDO Gilbert informed Petitioner that she had a final order of removal and had missed multiple flights. He showed Petitioner some papers and told her she needed to sign them. Gilbert refused Petitioner's request to show the papers to her family. When Petitioner asked about her attorney, Gilbert assented, but Petitioner was not able to speak with her attorney at that moment. Petitioner refused to sign anything. Petitioner informed Gilbert about her pending habeas petition. However, Gilbert said there was nothing from the court stopping them from deporting Petitioner and that if she refused, she could face more fines and penalties. Gilbert also said that if Petitioner did not comply, they may have to forcefully remove her. Gilbert left but said he would be back on October 29 to deport Petitioner. (Id. at 4.)

On October 29, 2025, SDDO Gilbert visited Petitioner again. Gilbert said the judge had not approved anything and Petitioner could still be deported at any time. Gilbert said there is a hearing on November 4, 2025 but there has not been a ruling from the judge yet. He said he would be back again on November 5 to deport Petitioner. (ECF No. 20-1 at 4.)

Respondents have filed an opposition to the motion for TRO, and Petitioner has filed a reply. (ECF Nos. 16, 20.) The Court held a hearing on the motion on November 5, 2025.

\\\

\\\

## II.

## DISCUSSION

### A. Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Glossip v. Gross, 576 U.S. 863, 876 (2015) (internal quotation marks omitted) (quoting Winter, 555 U.S. at 20). The Ninth Circuit "has adopted the 'serious questions' test—a 'sliding scale' variant of the *Winter* test—under which a party is entitled to a preliminary injunction if it demonstrates":

> (1) "serious questions going to the merits," (2) "a likelihood of irreparable injury," (3) "a balance of hardships that tips sharply towards the plaintiff," and (4) "the injunction is in the public interest." *Id.* at 1135.[8] As to the first factor, the serious questions standard is "a lesser showing than likelihood of success on the merits." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

Flathead-Lolo-Bitterroot Citizen Task Force v. Montana, 98 F.4th 1180, 1190 (9th Cir. 2024) (footnote added).

"The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1023 (9th Cir. 2009)). "'Status quo ante litem' refers to 'the last uncontested status which preceded the pending controversy.'" Boardman, 822 F.3d at 1024 (quoting GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000)).

### B. Likelihood of Succeeding on the Merits

Petitioner raises three claims for relief: (1) Petitioner's re-detention without a pre-deprivation hearing and her possible removal to a third country without notice and an opportunity to be heard violate her procedural due process rights under the Fifth Amendment; (2)

---

[8] Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

Petitioner's detention is not reasonably related to any legitimate purpose and violates Petitioner's substantive due process rights under the Fifth Amendment; and (3) Respondents' refusal to provide adequate health and safety violates Petitioner's substantive due process rights under the Fifth Amendment. (ECF No. 1 at 17–25.)

1. Procedural Due Process Claim Regarding Parole Revocation

Petitioner contends that she is likely to succeed on the merits of her procedural due process claim because she has a protected liberty interest in her conditional release and the government was required to give her a pre-deprivation hearing before detaining her. (ECF No. 9 at 12.) "A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." Wilson v. Lynch, 835 F.3d 1083, 1098 (9th Cir. 2016) (quoting Brewster v. Bd. of Educ., 149 F.3d 971, 982 (9th Cir. 1998)). The Court will address each element in turn.

**a. Liberty Interest**

Petitioner asserts that she "retains a weighty liberty interest under the Due Process Clause of the Fifth Amendment in avoiding re-incarceration," citing to Young v. Harper, 520 U.S. 143 (1997), Gagnon v. Scarpelli, 411 U.S. 788 (1973), and Morrissey v. Brewer, 408 U.S. 471 (1972). (ECF No. 9 at 12.) Respondents argue that "Petitioner's reliance on *Morrissey v. Brewer*, 408 U.S. 471 (1972) and its progeny is misplaced. *Morrissey* arose from the due process requirement for a hearing for revocation of parole. *Id*. at 472–73. It did not arise in the context of immigration." (ECF No. 16 at 4.)

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." Zadvydas, 533 U.S. at 690. In Morrissey v. Brewer, the Supreme Court addressed whether due process requires a parolee be afforded some opportunity to be heard prior to revocation of parole. 408 U.S. at 472. In examining "the nature of the interest of the parolee in his continued liberty," the Supreme Court stated:

> The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. . . . The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions.

Morrissey, 408 U.S. at 482. The Supreme Court found "that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others" and held that "the liberty is valuable and must be seen as within the protection of" due process. Morrissey, 408 U.S. at 482

Relying on Morrissey, courts in this district have consistently held that noncitizens who have been released from immigration custody pending civil removal proceedings have a protected liberty interest in remaining out of immigration custody. See, e.g., Doe v. Becerra, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025); J.A.E.M. v. Wofford, No. 1:25-cv-01380-KES-HBK (HC), 2025 WL 3013377, at *3–6 (E.D. Cal. Oct. 27, 2025); J.C.L.A. v. Wofford, No. 1:25-cv-01310-KES-EPG (HC), 2025 WL 2959250, at *3–5 (E.D. Cal. Oct. 17, 2025); Qazi v. Albarran, No. 2:25-cv-02791-TLN-CSK, 2025 WL 3033713, at *4 (E.D. Cal. Oct. 10, 2025); Martinez Hernandez v. Andrews, No. 1:25-cv-01035 JLT HBK, 2025 WL 2495767, at *10 (E.D. Cal. Aug. 28, 2025); Yang v. Kaiser, No. 2:25-cv-02205-DAD-AC (HC), 2025 WL 2791778, at *8 (E.D. Cal. Aug. 20, 2025); Maklad v. Murray, No. 1:25-cv-00946 JLT SAB, 2025 WL 2299376, at *7–8 (E.D. Cal. Aug. 8, 2025). Accordingly, the Court finds that Petitioner has a protected liberty interest in remaining out of immigration custody.

### b. Denial of Adequate Procedural Protections

Although Petitioner "followed all terms of her release and appeared at all check-ins as required . . . ICE rearrested Ms. Khan without showing any changed circumstances[.]" (ECF No. 9 at 14 (quotation mark and citation omitted).) Respondents contend that "[t]he procedural process provided to Petitioner is constitutionally adequate in the circumstances." (ECF No. 16 at

4.) Respondents do not expound on what "procedural process" was actually provided to Petitioner, and indeed they cannot because Petitioner did not receive any process whatsoever prior to being re-detained on October 6, 2025, after having been on conditional release for five years. Accordingly, the Court finds that Petitioner was denied adequate procedural protections.

### c. Pre-Deprivation Hearing

Applying Mathews v. Eldridge, 424 U.S. 319 (1976), Petitioner argues that "due process mandates that she receive notice and a hearing before a neutral adjudicator prior to any re-arrest." (ECF No. 9 at 14.) In Mathews, the Supreme Court held that "identification of the specific dictates of due process generally requires consideration of three distinct factors":

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

Mathews, 424 U.S. at 334.

With respect to the first factor, the Court finds that the private interest at issue is fundamental. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." Zadvydas, 533 U.S. at 690. Here, Petitioner has been out of custody for more than five years, and during that time she has complied with all conditions, never missed a check-in, and continued to care for and support her daughter, husband, ailing sister-in-law, and other members of the Altadena community, which is still grappling with the devastating effects of the Eaton fire. (ECF No. 9 at 4–5; ECF No. 9-2 at 10–11; ECF No. 9-3 at 5.) "The length of time [s]he was on supervised release, as well as petitioner's ties to h[er] community, strengthen petitioner's interest in h[er] continued release." Yang, 2025 WL 2791778, at *8.

"[W]hile acknowledging the Petitioner has a strong liberty interest," Respondents argue that "hers is a lesser liberty interest because she is subject to a final removal order," citing to Diouf v. Napolitano, 634 F.3d 1081, 1086–87 (9th Cir. 2011). The Court does not find this argument persuasive. Although the Ninth Circuit acknowledged that the "government may be

9

correct that *at the margin*," detainees subject to a final order of removal may "have a lesser liberty interest in freedom from detention," it found that "the government makes too much of this distinction" because "[r]egardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention." Diouf, 634 F.3d at 1086–87 (emphasis added). Thus, the Ninth Circuit held that the liberty interests of detainees subject to a final order of removal "are comparable" to those of detainees not subject to a final order of removal. Id. at 1087.

Respondent also argues that Petitioner's private interest is diminished because "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." (ECF No. 16 at 5 (alteration added) (quoting Mathews v. Diaz, 426 U.S. 67, 79–80 (1976)).) While it is true that "Congress may make rules as to aliens that would be unacceptable if applied to citizens," Demore v. Kim, 538 U.S. 510, 522 (2003), the Ninth Circuit has nevertheless recognized that it "is beyond dispute" an immigration detainee's "private interest at issue here is 'fundamental': freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'" Hernandez v. Sessions, 872 F.3d 976, 993 (9th Cir. 2017) (quoting Foucha v. Louisiana, 504 U.S. 71, 80 (1992)).

With respect to the second factor, Respondents argue that 8 U.S.C. § 1231(a)(6) "indisputably authorizes Petitioner's detention to effectuate her final order of removal" and "Petitioner is further afforded the procedural safeguards provided by regulations, including those contained in 8 C.F.R. § 241.4[9] . . . and § 241.13[10][.]" (ECF No. 16 at 5 (footnotes added).) The

---

[9] "Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(l)(1).

[10] "The Service may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). "Upon revocation, the alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision. The revocation custody review will include an evaluation of any contested facts relevant to the revocation

1  record before this Court does not show that Respondents complied with any of the procedural

2  safeguards provided by said regulations. "This fact suggests that the procedures created by the

3  regulatory framework have proven insufficient to meaningfully mitigate the risk of erroneous

4  deprivation of liberty in this case." Yang, 2025 WL 2791778, at *9. See Guillermo M. R. v.

5  Kaiser, No. 25-CV-05436-RFL, --- F. Supp. 3d. ----, 2025 WL 1983677, at *7–8 (N.D. Cal. July

6  17, 2025). "The court therefore rejects respondents' contention that the regulatory framework

7  sufficiently mitigates the risk of an erroneous deprivation of petitioner's liberty interest." Yang,

8  2025 WL 2791778, at *9.

> The Supreme Court has consistently held that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *See Zinermon*, 494 U.S. at 127, 110 S.Ct. 975 (emphasis in original). Certainly, there may be situations that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128, 110 S.Ct. 975 (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable). However, absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due process, particularly where an individual has been released on bond by an IJ. *See, e.g., Ortega*, 415 F. Supp. 3d at 970; *Vargas*, 2020 WL 5074312, at *3–4; *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050, 1056 (N.D. Cal. 2021).

16 Guillermo M. R., 2025 WL 1983677, at *9. Thus, "'the risk of an erroneous deprivation [of

17 liberty] is high' where, as here, '[the petitioner] has not received any bond or custody

18 redetermination hearing.'" J.A.E.M., 2025 WL 3013377, at *7 (alterations in original) (quoting

19 A.E. v. Andrews, No. 1:25-cv-00107-KES-SKO, 2025 WL 1424382, at *5 (E.D. Cal. May 16,

20 2025)).

21    With respect to the third and final factor, "although the government has a strong interest

22 in enforcing the immigration laws, the government's interest in detaining petitioner without a

23 hearing is 'low.'" J.A.E.M., 2025 WL 3013377, at *7 (citing Ortega v. Bonnar, 415 F. Supp. 3d

24 963, 970 (N.D. Cal. 2019); Doe, 787 F. Supp. 3d at 1094). See Henriquez v. Garland, No. 5:22-

25 cv-00869-EJD, 2022 WL 2132919, at *5 (N.D. Cal. June 14, 2022) ("Although the Government

26 has a strong interest in enforcing the immigration laws and in ensuring that lawfully issued

---

28 and a determination whether the facts as determined warrant revocation and further denial of release." 8 C.F.R. § 241.13(i)(3).

11

removal orders are promptly executed, the Government's interest in detaining Petitioner without providing an individualized bond hearing is low."). Courts generally have found that the cost of providing a custody hearing is relatively minimal, and there is nothing in the record before this Court demonstrating that providing Petitioner with a pre-deprivation hearing would be fiscally or administratively burdensome. See J.A.E.M., 2025 WL 3013377, at *7 ("In immigration court, custody hearings are routine and impose a 'minimal' cost." (citing Doe, 787 F. Supp. 3d at 1094)).

Based on the foregoing, Petitioner has demonstrated that she is likely to succeed in showing that she "has a strong liberty interest in remaining out of custody, that the risk of erroneous deprivation will be meaningfully reduced by requiring a pre-detention hearing before an immigration judge, and that the governmental burden in providing such procedure is quite minimal." Yang, 2025 WL 2791778, at *10.

### 2. Procedural Due Process Claim Regarding Third-Country Removals

Petitioner contends that she is likely to succeed on the merits of her procedural due process claim because "[n]on citizens are generally entitled to seek humanitarian protection—including asylum, withholding of removal, and the Convention Against Torture—from any country to which they may be removed," and thus, "[d]eporting Petitioner to any country as to which she has not had an opportunity to seek protection relief would violate her rights to protection relief under the immigration laws, including 8 C.F.R. 1240.11(c)(1) and the Convention Against Torture." (ECF No. 9 at 11.) Respondents assert that "[t]o the extent the TRO seeks to prevent Petitioner's removal, this Court lacks jurisdiction to do so," citing to 8 U.S.C. § 1252(g). (ECF No. 16 at 6.)

**a. Jurisdiction**

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). "[T]he express instructions of the Supreme Court, our precedent, and common sense . . . require us to read the statute narrowly." Arce v. United States, 899 F.3d 796, 800 (9th Cir. 2018). This Court is "bound by [Ninth Circuit] precedent that limits § 1252(g)'s scope to discretionary decisions that the Attorney General actually has the power to make, as compared to the violation of his mandatory duties." Id. at 801 (citing Barahona-Gomez v. Reno, 236 F.3d 1115, 1120–21 (9th Cir. 2001)). "[R]elief under withholding of removal is mandatory if the petitioner establishes that his 'life or freedom would be threatened' in the country to which he would be removed on account of one of the five protected grounds." Nadarajah v. Gonzales, 443 F.3d 1069, 1081–82 (9th Cir. 2006) (citing 8 U.S.C. § 1231(b)(3)(A); Boer–Sedano v. Gonzales, 418 F.3d 1082, 1092 (9th Cir. 2005)). "Withholding of removal is also mandatory if the applicant meets his burden of proof regarding the likelihood of future torture on application for relief under the Convention Against Torture." Nadarajah, 443 F.3d at 1082 (citing 8 U.S.C.A. § 1231(b)(3); 8 C.F.R. §§ 1208.16–1208.18). Therefore, this "Court has jurisdiction to hear" the question of "what right [Petitioner] ha[s], under the Constitution and relevant statutes, to make that showing." D.V.D. v. U.S. Dep't of Homeland Sec., 778 F. Supp. 3d 355, 378 (D. Mass. 2025).[11] Accord Y.T.D. v. Andrews, No. 1:25-cv-01100 JLT SKO, 2025 WL 2675760, at *5 (E.D. Cal. Sept. 18, 2025) ("Though 8 U.S.C. § 1252(g), precludes this Court from exercising jurisdiction over the executive's decision to 'commence proceedings, adjudicate cases, or execute removal orders against any alien,' this Court has habeas jurisdiction over the issues raised here, namely the lawfulness of his continued detention and the process required in relation to third country removal."); J.R. v. Bostock, No. 2:25-CV-01161-JNW, 2025 WL 1810210, at *3 (W.D. Wash. June 30, 2025) ("J.R.'s claim that the Government has violated the APA by failing to carry out non-discretionary statutory duties and provide due process to seek withholding of removal under CAT is the gravamen of his suit. Therefore, Section 1252(g) does not strip this Court of jurisdiction to issue injunctive relief in this case.").

---

[11] The Supreme Court has stayed the district court's preliminary injunction "pending disposition of any appeal and petition for writ of certiorari." Dep't of Homeland Sec. v. D.V.D., 145 S. Ct. 2627, 2629 (2025).

1  Respondents' reliance on Rauda v. Jennings, 55 F.4th 773 (9th Cir. 2022), is unavailing.
2  In Rauda, the Ninth Circuit interpreted § 1252(g) as depriving federal courts of jurisdiction to
3  hear claims seeking to enjoin the government from removing a noncitizen from the United States
4  prior to a ruling on a motion to reopen, id. at 775, which is not what Petitioner is asking the
5  Court to do here.

### b. Notice and Opportunity to Seek Humanitarian Protection

7  "'It is well established that the Fifth Amendment entitles aliens to due process of law' in
8  the context of removal proceedings." Trump v. J. G. G., 604 U.S. 670, 673 (2025) (quoting Reno
9  v. Flores, 507 U.S. 292, 306 (1993)). "[A] basic tenet of constitutional due process [is] that
10 individuals whose rights are being determined are entitled to notice of the issues to be
11 adjudicated, so that they will have the opportunity to prepare and present relevant arguments and
12 evidence." Andriasian v. I.N.S., 180 F.3d 1033, 1041 (9th Cir. 1999). Thus, "[f]ailing to notify
13 individuals who are subject to deportation that they have the right to apply for asylum in the
14 United States and for withholding of deportation to the country to which they will be deported
15 violates both INS regulations and the constitutional right to due process." Andriasian, 180 F.3d
16 at 1041. Accord Ibarra-Perez v. United States, No. 24-631, --- F.4th -----, 2025 WL 2461663, at
17 *5 (9th Cir. Aug. 27, 2025) ("DHS must also 'notify individuals who are subject to deportation
18 that they have the right to apply for asylum in the United States and for withholding of
19 deportation to the country to which they will be deported'; otherwise, DHS violates their
20 constitutional right to due process." (quoting Andriasian, 180 F.3d at 1041)).
21  Here, as set forth in more detail in section I, *supra*, even as she was being transported to
22 LAX, Petitioner was not provided any notice regarding to which country she was being removed
23 much less that she has the right to apply for asylum and for withholding of removal to such
24 country. Respondents have chosen not to respond to the merits of this due process claim, instead
25 relying solely on their argument that this Court lacks jurisdiction pursuant to 8 U.S.C. § 1252(g).
26 Under Ninth Circuit precedent, Petitioner is likely to succeed on her claim that removal to a third
27 country without meaningful notice and an opportunity to seek humanitarian protection would
28

violate due process.[12]

### C. Likelihood of Suffering Irreparable Harm

"In addition to a likelihood of success on the merits, '[a] plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief.'" Hernandez, 872 F.3d at 994 (quoting Winter, 555 U.S. at 20). In Hernandez, the Ninth Circuit found the district court did not abuse its discretion in entering an injunction that required immigration officials to consider financial circumstances and alternative conditions of release at the bond hearings of a class of noncitizens in removal proceedings who were detained pursuant to 8 U.S.C. § 1226(a). Hernandez, 872 F.3d at 981–82. With respect to the second Winter factor, the Ninth Circuit found:

> Here, Plaintiffs have established a likelihood of irreparable harm by virtue of the fact that they are likely to be unconstitutionally detained for an indeterminate period of time.
>
> "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Thus, it follows inexorably from our conclusion that the government's current policies are likely unconstitutional—and thus that members of the plaintiff class will likely be deprived of their physical liberty unconstitutionally in the absence of the injunction—that Plaintiffs have also carried their burden as to irreparable harm.

Hernandez, 872 F.3d at 994–95. Similarly, here, the Court has concluded that Petitioner is likely to succeed on the merits of her due process claims, and thus, Petitioner has "established a likelihood of irreparable harm by virtue of the fact that [she is] likely to be unconstitutionally detained for an indeterminate period of time" in the absence of preliminary relief. Id. at 994. See Baird v. Bonta, 81 F.4th 1036, 1040 (9th Cir. 2023) ("It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury. If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation."); Y.T.D., 2025 WL 2675760, at *12 ("[T]he irreparable harm resulting from third-country removal without sufficient opportunity

---

[12] The Court declines to address Petitioner's substantive due process claims at this time.

to apply for fear-based protection 'is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable.'" (quoting D.V.D., 778 F. Supp. 3d at 391)).

### D. Balance of Equities and the Public Interest

To obtain a preliminary injunction, Petitioner must also demonstrate that "the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" Baird, 81 F.4th at 1040 (citing Nken v. Holder, 556 U.S. 418, 435 (2009); Roman v. Wolf, 977 F.3d 935, 940–41 (9th Cir. 2020) (per curiam)). "A plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." Baird, 81 F.4th at 1042. "Because 'public interest concerns are implicated when a constitutional right has been violated, . . . all citizens have a stake in upholding the Constitution,' meaning 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" Baird, 81 F.4th at 1042 (first quoting Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005); then quoting Riley's American Heritage Farms v. Elsasser, 32 F.4th 707, 731 (9th Cir. 2022)). "The government also 'cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.'" Baird, 81 F.4th at 1042 (quoting Zepeda v. INS, 753 F.2d 719, 727 (9th Cir. 1983)). Accordingly, the Court finds that the balance of equities tips in Petitioner's favor and that an injunction is in the public interest.

### E. Conclusion

In sum, the Court finds that the requirements for issuing a preliminary injunction are satisfied. "Petitioner's immediate release is required to return [her] to the status quo ante." J.A.E.M., 2025 WL 3013377, at *8 (collecting cases). Respondents may not re-detain Petitioner unless the government proves by clear and convincing evidence at a custody hearing before a neutral decisionmaker that Petitioner is a flight risk or danger to the community. See Martinez v. Clark, 124 F.4th 775, 784–86 (9th Cir. 2024) (confirming that the government bears the "clear-and-convincing burden of proof" at an immigration bond hearing ordered pursuant to the Due Process Clause). Respondents may not remove Petitioner to any country as to which she has not had an opportunity to seek protectionary relief under the immigration laws, including 8 C.F.R.

§ 1240.11(c)(1) and the Convention Against Torture.

**F. Bond**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The district court retains discretion 'as to the amount of security required, *if any*.'" Diaz v. Brewer, 656 F.3d 1008, 1015 (9th Cir. 2011) (quoting Johnson v. Couturier, 572 F.3d 1067, 1086 (9th Cir. 2009)). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003). "Courts regularly waive security in cases like this one," J.A.E.M., 2025 WL 3013377, at *9 (collecting cases), and given the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," Zepeda, 753 F.2d at 727, the Court finds that no security is required.

## III.

## ORDER

Accordingly, the Court HEREBY ORDERS that:

1. Petitioner's motion for temporary restraining order (ECF No. 9) is converted to a motion for preliminary injunction and it is **GRANTED**;

2. Respondents **SHALL IMMEDIATELY RELEASE** Petitioner Masuma Khan from custody under the conditions of her most recent order of supervision;

3. Respondents are **ENJOINED AND RESTRAINED** from re-detaining Petitioner absent a pre-deprivation hearing before a neutral decisionmaker at which the government must prove by clear and convincing evidence that Petitioner is a flight risk or danger to the community such that her re-detention is warranted;

4. Respondents are **ENJOINED AND RESTRAINED** from removing Petitioner to any country as to which she has not had an opportunity to seek protectionary relief under the immigration laws, including 8 C.F.R. § 1240.11(c)(1) and the Convention Against

17

Torture;

5. The October 24, 2025 minute order (ECF No. 12), which was confirmed on November 3, 2025 (ECF No 23), is VACATED;

6. Within **seven (7) days** of the date of this order, the parties SHALL meet and confer and submit a joint statement regarding procedures for the remainder of this case, including:

    a. whether further briefing is needed with respect to this Court retaining jurisdiction to conduct a pre-deprivation hearing to the extent Respondents intend to re-detain Petitioner; and

    b. a briefing schedule related to the merits of the petition.

IT IS SO ORDERED.

Dated:   **November 5, 2025**           /s/ Erica P. Grosjean
                                        UNITED STATES MAGISTRATE JUDGE